UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x
                :

KARA DAVIS, <u>et al.</u>,           :
                :

           <u>Plaintiffs</u>,    :         03 Civ. 0503 (GEL)
                :

      -v.-          :        **<u>OPINION AND ORDER</u>**
                :

THE CITY OF NEW YORK, <u>et al.</u>  :
                :

          <u>Defendants</u>.   :
                :

-----------------------------------------------------------------x

Daniel M. Perez, Kuby & Perez LLP, New York,
NY, <u>for Plaintiffs</u>.

Christine C. Burgess, Assistant Corporation Counsel
(Michael A. Cardozo, Corporation Counsel of the
City of New York, Susan M. Halatyn, Assistant
Corporation Counsel, on the brief), New York, NY
<u>for Defendants</u>.

GERARD E. LYNCH, <u>District Judge</u>:

      On January 31, 2002, the first day of the 2002 World Economic Forum ("WEF") meeting

in New York City, plaintiffs Kara Davis, Suzy-Lee Korn, Sharonann Lynch, Eustacia Smith, and

Jacqueline Vimo, members of the AIDS Coalition to Unleash Power ("ACT-UP"), were arrested

while attempting to hang a banner, which bore the ACT-UP logo and the words "GWB AND

BIG BIZ AGREE–PEOPLE WITH AIDS DROP DEAD," on a downtown Manhattan building.[1]

On January 23, 2003, plaintiffs brought this suit against defendants Lieutenant Arturo Mendez,

---

[1] Sarinya Sriaskul and Jennifer Flynn, also affiliated with ACT-UP, accompanied plaintiffs to
downtown Manhattan, but rather than participate in plaintiffs' attempt to hang the ACT-UP
banner, met with members of the press. Sriaskul and Flynn were not arrested and are not parties
to this lawsuit. (Lynch Dep. 46-49; Smith Dep. 58.) Elsewhere in Manhattan, Mark Milano and
Hugh Loftus, also ACT-UP members, were arrested for their attempts to hang a related banner
near F.D.R. Drive. (Flynn Dep. 45.) Milano and Loftus are also not parties to this case.

Sergeant Charles Famulari, Police Officers Timothy O'Neill, Stephen Biscotti, and Donald

Gaghan, and the City of New York, alleging various violations of rights secured by 42 U.S.C. §

1983, the First, Fourth, and Fourteenth Amendments of the federal Constitution, and New York

state constitutional and common law.[2]  The defendants now move for summary judgment on all

counts.  For the reasons discussed below, the motion will be granted in part and denied in part.

## BACKGROUND

I.    Factual Background

The events central to plaintiffs' claims took place on January 31, 2002, the first day of the

2002 WEF.[3]  On that day, the five plaintiffs attempted to hang a banner critical of the

governmental and corporate response to AIDS from a building located at 124 Watts Street.  (P.

56.1 Counterstmt. No. 7; D. 56.1 Stmt. Nos. 1-2.)  On that day, defendants Famulari, Mendez,

O'Neill, Biscotti, and Gaghan, were assigned to "polic[e] the [WEF]" near the Holland Tunnel,

rather than to perform their usual administrative work in the Chief of Department's Office.

(Famulari Dep. 15.)  Famulari and O'Neill were in the immediate vicinity of 124 Watts Street

when plaintiffs arrived at the building.  (Id. 82-83.)

---

[2]   The complaint also referred to John Does 1 through 5, but these defendants were never further
identified or served.

[3]   The Court summarizes these events with a view not toward factfinding, but rather toward
presenting context for this motion.  Although in the usual course, the Court relies on the parties'
Local Rule 56.1 statements to isolate factual disputes, in this case, since the plaintiffs'
counterstatement does not correspond to defendants' Rule 56.1 statement, the Rule 56.1
statements were less useful.  Defendants submitted a revised Rule 56.1 statement with their reply
brief, presumably as a response to plaintiffs' charge that defendants' original Rule 56.1 statement
relied on overly broad citations to the record – indeed defendants' original submission refers to
whole depositions (sometimes more than one at a time) to support a single assertion.  Citations to
defendants' Rule 56.1 statement refer to the amended statement.

After all five plaintiffs arrived at the building in a van, two of the plaintiffs ascended to the roof by climbing a staircase attached to the exterior of the building and then using a ladder to bridge the gap between the staircase and the roof.  (D. 56.1 Stmt Nos. 12-13; P. 56.1 Counterstmt Nos. 17-18.)  Three of the plaintiffs remained on the sidewalk.  (Lynch Dep. 51-53; Smith Dep. 54-55; Davis Dep. 17.)

According to Famulari, he and O'Neill observed the plaintiffs approach the building and ascend to the roof of 124 Watts Street with an extension ladder and what appeared to be a black bag.  (Famulari Dep., 87; O'Neill Dep. 107.)[4]  Famulari believed a burglary was in process and called for back-up.  (D. 56.1 Stmt. Nos. 20-21.)  "Within seconds," Mendez, Biscotti, and Gaghan arrived at the scene.  (O'Neill Dep. 190; D. 56.1 Stmt. No. 22.)  Two officers climbed up to the roof to tell Vimo and Korn to come down.[5]  (P. 56.1 Stmt. No. 24.)  While on the roof, O'Neill determined that plaintiffs Vimo and Korn were not carrying a bag but canvas with writing on it.  (O'Neill Dep. 21, 196.)  Although there is no dispute that the banner was not completely unfurled at the time that Vimo and Korn were stopped on the roof, it is unclear to what extent the banner was unfurled and whether defendants saw any portion of the message on plaintiffs' banner at the time of the arrest.  (Vimo 95; Korn 93-94.)[6]  When O'Neill descended

---

[4]  Although O'Neill stated that four of the plaintiffs ascended to the roof of 124 Watts (O'Neill Dep. 178),  Famulari stated, and the plaintiffs contend, that only two did.  (See D. 56.1 Stmt. No. 13.)

[5]  The record contains conflicting deposition testimony as to which plaintiffs and officers were on the roof together.  (Famulari 120; O'Neill Dep. 223.)  The defendants do not contest the plaintiffs' assertions that Korn and Vimo were on the roof (See D. 56.1 Stmt. No. 23), or that O'Neill and an unidentified officer went up to the roof.  (P. 56.1 Counterstmt. No. 24.)

[6]  When asked at his deposition about the contents of the banner, O'Neill testified that the banner contained "[s]ome reference to 'AIDS,' 'big business,' and 'Act-Up' " and answered "Yes" when

from the roof he informed Famulari that the plaintiffs were trying to hang a banner. (Famulari Dep. 147-48.)

The parties provide slightly differing accounts of the sequence of events leading up to plaintiffs' arrests. According to Famulari, after the two plaintiffs on the roof joined the three on the sidewalk, he asked them whether they had permission to be at the location. When the plaintiffs did not respond, Famulari placed them under arrest. (Famulari Dep. 148, 152.) In contrast, plaintiffs assert that defendants asked the plaintiffs who remained on the sidewalk questions about their backgrounds, but do not state that defendants asked them about their permission to be on the building. (P. 56.1 Stmt. No. 21.) Lynch testified that in addition to being asked whether she was trying to burglarize the building, an officer asked her whether she "c[ame] in for the World Economic Forum," to which she responded "[y]es." (Lynch 53.) Moreover, Vimo testified that she and Korn were handcuffed while on the external staircase before reaching the sidewalk. (Vimo Dep. 97.)

Each plaintiff was charged with one count of criminal trespass in the third degree, a misdemeanor, and unlawful posting, an administrative code violation. Gaghan signed the criminal court complaints against Smith, Lynch, and Vimo; O'Neill signed the complaint against Korn and Davis. Famulari signed a supporting deposition against Smith, Lynch and Vimo.

On February 1, 2002, after routine processing, Davis and Korn were released twenty-two hours after their arrests, and Vimo, Lynch, and Smith were released nineteen-and-a-half hours

---

asked whether the banner also referred to "Bush." (O'Neill 221.) This questioning took place while O'Neill was being asked about what happened on the roof, and consequently suggests, although the questions are not specific as to when O'Neill first saw the words on the banner, that he had some awareness of the banner's contents while on the roof with plaintiffs.

after their arrests.  (P. 56.1 Counterstmt. No. 52.)  Desk officer Mitzie Palmer, who is not a

defendant in this case, had denied the plaintiffs Desk Appearance Tickets ("DATs"), the issuance

of which would have led to plaintiffs' quicker release.  Palmer testified that she denied plaintiffs'

requests for DATs because plaintiffs did not verify their addresses.  (Palmer Dep. 93-96.)  On

April 4, 2002, the plaintiffs moved to dismiss the criminal charges based on facial insufficiency.

(P. 56.1 Stmt. No. 53.)  The District Attorney did not oppose the motion and the charges against

the plaintiffs were dismissed.  (P. 56.1 Stmt. No. 54.)

II.     Procedural Background

In their complaint and first amended complaint, plaintiffs brought nine counts charging

the defendant police officers with false arrest, malicious prosecution, intentional infliction of

emotional distress, and First and Fourteenth Amendment violations, and charging New York City

with negligent hiring screening, retention, supervision and training, respondeat superior, and

liability under Monell v. Dep't of Social Services, 436 U.S. 658 (1978) for an alleged de facto

NYPD policy of subduing the WEF protests by arresting and detaining protestors for unduly long

periods of time.  In their memorandum in opposition to defendants' summary judgment motion,

however, plaintiffs withdrew their claims of intentional infliction of emotional distress

altogether, their malicious prosecution claims against defendants Biscotti and Mendez, and their

claims against New York City for negligent hiring screening, retention, supervision and training,

and Monell liability.  (P. Mem. 43.)

Six claims remain:  The First and Sixth Claims charge defendant police officers with

false arrest in violation of Fourth and Fourteenth Amendment rights as secured by 42 U.S.C. §

1983, and New York state law.[7]  The surviving portions of the Second and Fifth Claims charge defendant police officers Famulari, O'Neill, and Gaghan, with malicious prosecution in violation of Fourth and Fourteenth Amendment rights as secured by 42 U.S.C. § 1983, and New York state law.  The Third Claim charges the defendants with violations of rights secured by the First and Fourteenth Amendments and 42 U.S.C. § 1983 for false arrest and malicious prosecution as retaliation against protected speech.  Finally, the Ninth Claim charges New York City with respondeat superior liability for the underlying state tort claims.  Defendants move to dismiss these remaining six claims.

## DISCUSSION

I.    Summary Judgment Standard

Summary judgment must be granted where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c)).  A fact is "material" if it "might affect the outcome of the suit under the governing law," and an issue of fact is "genuine" where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  On a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party, and the Court must resolve all ambiguities and draw all reasonable inferences in its favor.  Id. at 255; Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 202 (2d Cir. 1995).

---

[7]  Although plaintiffs also refer to a false imprisonment claim, "[i]n New York, the tort of false arrest is synonymous with that of false imprisonment,"  Posr v. Doherty, 944 F.2d 91, 96 (2d Cir. 1991), and thus the Court's disposition of the false arrest claim will simultaneously dispose of any false imprisonment claim.

To defeat a motion for summary judgment, however, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "[C]onclusory allegations or unsubstantiated assertions" will not suffice. Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998). Rather, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 587 ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' ") (quoting First Nat'l Bank v. Cities Service Co., 391 U.S. 253, 289 (1968)).

II.     False Arrest and Malicious Prosecution

Section 1983 false arrest and malicious prosecution claims rooted in the Fourth and Fourteenth Amendments are "substantially the same" as false arrest and malicious prosecutions claims under New York state law, Boyd v. City of New York, 336 F.3d 72, 75 (2d Cir. 2003), with the exception that § 1983 requires that the tortfeasor act "under color of state law." Posr v. Doherty, 944 F.2d 91, 94-95 (2d Cir. 1991); Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996); Raysor v. Port Auth., 768 F.2d 34, 39-40 (2d Cir. 1985). As there is no question that defendants were acting in their capacity as police officers during all times relevant to this dispute, they were clearly acting "under color of state law," and thus a finding of liability for either state false arrest or malicious prosecution would also require a finding of federal liability under § 1983 for the corresponding claim. Raysor, 768 F.2d at 40. Accordingly, plaintiffs' state and federal claims for false arrest and for malicious prosecution will be analyzed jointly.

The standards for false arrest and malicious prosecution claims under both New York and federal law are clear cut. To establish a false arrest claim, a plaintiff must show that: (1) the

defendant intentionally confined the plaintiff; (2) the plaintiff was aware of the confinement; (3) the plaintiff did not consent to the confinement; and (4) the confinement was not otherwise privileged. Smith v. City of New York, No. 03 Civ. 3048, 2005 WL 44449, *2 (S.D.N.Y. Jan 11, 2005). Probable cause to believe that the plaintiff committed a crime constitutes a privilege justifying the arrest. Marshall v. Sullivan, 105 F.3d 47, 50 (2d Cir. 1996). To make a claim of malicious prosecution, a plaintiff must show: (1) that the defendant commenced or continued a criminal proceeding against plaintiff; (2) that the proceeding was terminated in the plaintiff's favor; (3) an absence of probable cause for the proceeding; and (4) that the proceeding was instituted with malice. Kinzer v. Jackson, 316 F.3d 139, 143 (2d Cir. 2003) (citations omitted); Savino v. City of New York, 331 F.3d 63, 72 (2d Cir. 2003). For a malicious prosecution claim under § 1983, a plaintiff must also demonstrate "a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights." Rohman v. New York City Transit Authority, 215 F.3d 208, 215-16 (2d Cir. 2000); see Washington v. County of Rockland, 373 F.3d 310, 316-17 (2d Cir. 2004); Noga v. City of Schenectady Police Officers, 169 F. Supp. 2d 83, 90 (N.D.N.Y. 2001). Probable cause defeats a malicious prosecution claim. Boyd, 336 F.3d at 75.

Thus, probable cause constitutes an absolute defense to both false arrest and malicious prosecution claims. Id.; Singer v. Fulton County Sheriff, 63 F.3d 110, 118-19 (2d Cir. 1995); Granato v. City of New York, No. 98 Civ. 667, 1999 WL 1129611, at *5-*7 (E.D.N.Y. Oct. 18, 1999). Therefore, the central issue before the Court – and the focus of plaintiffs' and defendants' arguments – is whether there is a genuine issue of material fact as to the existence of probable cause. But since the "probable cause determination relevant to a malicious prosecution claim

differs from that relevant to a false arrest claim," Mejia v. City of New York, 119 F. Supp. 2d 232, 254 (E.D.N.Y. 2000), the Court will consider separately and in turn probable cause for the arrests and for prosecution.

A.     Probable Cause for the Arrests

Probable cause exists "when the authorities have knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." Calamia v. City of New York, 879 F.2d 1025, 1032 (2d Cir. 1989); see Rounseville v. Zahl, 13 F.3d 625, 629-30 (2d Cir. 1994) (probable cause exists where "the knowledge of facts, actual or apparent, [is] strong enough to justify a reasonable [person] in the belief that he has lawful grounds for prosecuting the defendant in the manner complained of") (internal quotations and citations omitted). "The existence of probable cause must be determined on the basis of the totality of the circumstances, [and] where law enforcement authorities are cooperating in an investigation . . . , the knowledge of one is presumed shared by all." Calamia, 879 F.2d at 1032 (citations and quotation marks omitted, ellipses in original); see United States v. Colon, 250 F. 3d 130, 135, 137 (2d Cir. 2001) (recognizing the collective knowledge doctrine and the analogous New York "fellow officer" rule). An officer retains probable cause to arrest a plaintiff "even if the probable cause was for a crime different from what the police officers believed to have been committed." Carter v. City of New York, No. 02 Civ. 8755, 2004 WL 2181107, at *12 n.11 (S.D.N.Y. Sept. 7, 2004) (internal citation and quotation marks omitted); Clarke v. City of New York, Nos. CV-96-5762, CV-98-7297, 1999 WL 608857, at *5-*6 (E.D.N.Y. July 22, 1999); see Scott v. United States, 436 U.S. 128, 137-38 (1978).

Defendants argue that they had probable cause to arrest plaintiffs for burglary or criminal trespass. (D. Mem. 9; D. Reply Br. 3.) Plaintiffs argue that defendants did not have probable cause to arrest plaintiffs for burglary, criminal trespass, or unlawful posting, and further contend that defendants could not have reasonably believed that the three plaintiffs on the sidewalk (Davis, Lynch, and Smith) were acting in concert with the two plaintiffs on the roof (Korn and Vimo). (P. Mem. 25-33.) Moreover, plaintiffs argue that "a jury reasonably could find based on circumstantial evidence in this record that Famulari and O'Neill knew *prior* to [the date of arrest that] plaintiffs intended to hang a banner from 124 Watts Street." (P. Mem. 32.) Although defendants did not have probable cause to arrest plaintiffs for unlawful posting or criminal trespass (the crimes plaintiffs were charged with), or for burglary, probable cause existed for the lesser offense of simple trespass, an offense which neither side addresses.

1.      Unlawful Posting, Criminal Trespass, and Burglary

The arresting officers plainly did not have probable cause to arrest plaintiffs for either charge that they originally pressed against the plaintiffs. On this motion, defendants do not even argue that they had probable cause to arrest plaintiffs for unlawful posting under New York Administrative Code §10.119(a). Indeed, none of the Code's prohibited methods of attaching a sign, nor any of its prohibited locations for posting, could describe the plaintiffs' actions in the case.[8]

---

[8] The ordinance makes it unlawful:

> for any person to paste, post, paint, print, nail or attach or affix by any means whatsoever any handbill, poster, notice, sign, advertisement, sticker or other printed material upon any curb, gutter, flagstone, tree, lamppost, awning post, telegraph pole, telephone pole, public utility pole, public garbage bin, bus shelter,

Nor did defendants have probable cause to arrest the plaintiffs for criminal trespass under New York Penal Law ("NYPL") § 140.10. That statute makes it a misdemeanor for a person to "knowingly enter[ ] or remain[ ] unlawfully in a building or upon real property (a) which is fenced or otherwise enclosed in a manner designed to exclude intruders," or which meets a number of other criteria irrelevant here. NYPL § 140.10. Although a prior version of the statute was worded in such a way that the phrase "which is fenced or otherwise enclosed" could have been construed as applying only to "real property," see People v. Santos, 700 N.Y.S.2d 381, 383-84 (Crim. Ct. N.Y. Co. 1999), the present structure of the statute compels the conclusion that the fencing/enclosure requirement the phrase applies to "building" as well, and every New York court that has addressed the issue in a reported opinion so construes it. See In re Lawrence K., 778 N.Y.S.2d 393, 393-94 (4th Dept. 2004); Santos, 700 N.Y.S.2d at 383-85; People v. Warren, 662 N.Y.S.2d 372, 373-74 (Monroe Co. Ct. 1997). Despite O'Neill's sole account otherwise (O'Neill Dep. 126-128), in light of the photographs of 124 Watts and the depositions in the record, a jury could reasonably conclude that no officer could reasonably believe that the external stairs and roof of the building, the only property on which defendants entered, were "fenced or otherwise enclosed in a manner to exclude intruders." (Perez Decl. Ex. A1 – A4; see also

---

bridge, elevated train structure, highway fence, barrel, box, parking meter, mailbox, traffic control device, traffic stanchion, traffic sign (including pole), tree box, tree pit protection device, bench, traffic barrier, hydrant, public pay telephone, any personal property maintained on a city street or other city-owned property pursuant to a franchise, concession or revocable consent granted by the city or other such item or structure in any street, or to direct, suffer or permit any servant, agent, employee or other person under his or her control to engage in such activity . . . .

New York Administrative Code §10.119(a).

Famulari Dep. 165 (building "is not enclosed by a fence designed to exclude intruders"); Biscotti Dep. at 35 ("I know the fence did not encompass the entire property."); Mendez Dep. at 55-57 ("Fully enclose it, no."); Gaghan Dep at 45 ("[N]o," fence did not enclose property.))

Nor was there probable cause to arrest plaintiffs for burglary, the crime that the defendants allegedly originally suspected plaintiffs were committing. Burglary, like the crime of criminal trespass, requires that the offender "knowingly enter[ ] or remain[ ] unlawfully in a building with intent to commit a crime therein." NYPL § 140.20. Defendants could not have reasonably believed that plaintiffs had "knowingly enter[ed] or remain[ed] unlawfully in a building," because being on the exterior of a building, including the roof or exterior stairs, does not constitute entry into a building. U.S. v. Eichman, 756 F. Supp. 143, 147-49 (S.D.N.Y. 1991) (entry into a building requires that the defendant "actually enter within the four walls or beneath the roof of a building"); People v. Diaz, 565 N.Y.S.2d 101, 102 (1st Dept. 1991) ("Trespassing on the roof and fire escape of an adjoining building . . . cannot be defined as being 'inside' a building."). Nor was there probable cause to arrest defendants for attempted burglary. By the time the defendants were arrested, the defendants clearly were aware that plaintiffs did not intend to enter the building to commit a crime therein, but rather intended to hang a banner to the exterior of the building.

2.      Simple Trespass

Despite the absence of probable cause as to criminal trespass or unlawful posting, based on the undisputed facts, the officers had probable cause to arrest the plaintiffs for simple trespass

under N.Y. Penal Law § 140.05.[9]  Trespass is a violation.  Unlike criminal trespass under §

140.10, there is no requirement under § 140.05 that the property be enclosed or fenced.

"A person is guilty of trespass when he knowingly enters or remains unlawfully in or

upon premises."  Id.  A person cannot trespass onto premises which are "open to the public" or

on which s/he is otherwise licensed or privileged to be.  N.Y. Penal Law § 140.00.  The

determination of whether a building is open to the public is usually a question of fact.  People v.

Ayuso, 614 N.Y.S.2d 162 (2d Dep't 1994); People v. Eady, 542 N.Y.S.2d 70 (4th Dep't 1989);

People v. Huntley, 529 N.Y.S.2d 637 (4th Dep't 1988); People v. Hirniak, 500 N.Y.S.2d 62 (2d

Dep't 1986).

Here, the relevant facts are undisputed.  The parties agree that the building at 124 Watts

appeared to be unused, without any "No Trespassing" signs, that the external staircase did not

reach the roof and the roof could only be accessed with a ladder, and that two public payphones

were attached to the building.  The picture of 124 Watts submitted in connection with this motion

shows a building covered with graffiti, with an external staircase reaching about two-thirds of the

way from the ground to the roof, beneath which garbage is strewn.  (Perez Decl. Ex. A1-A4;

Davis Dep. 18 (external staircase "ended several feet below the roof edge").)  Based on the

inaccessibility of the roof (without the help of an extension ladder), and the lack of apparent

commercial or residential use of the building, the defendants reasonably determined that the roof

was not open to the public.  No evidence known to the officers suggested, nor do plaintiffs claim,

---

[9]  As pointed out before, neither defendants nor plaintiffs raised this crime as a potential basis for probable cause.  But the probable cause determination is an objective one that pays no heed to the subjective thoughts of the officers effectuating arrest, see Devenpeck v. Alford, 125 S. Ct. 588, 593-94 (2004), or, by extension, to the subjective post-arrest evaluation of the lawyers defending the validity of the arrests.

13

that plaintiffs were licensed or privileged to be on the roof. The record presents no grounds on which a reasonable fact-finder could conclude that defendants were unreasonable in believing that plaintiffs Vimo and Korn were trespassing on 124 Watts, and thus committing a crime in their presence.[10]

The New York Penal Code does not require "No Trespassing" signs to indicate that property is closed to the public. New York courts have ruled that areas of an occupied building may be closed to the public even if there are no signs posted, but have not significantly addressed how this applies to unoccupied buildings. See, e.g., State v. Segal 358 N.Y.S.2d 866, 872-73 (N.Y. Crim. Ct. 1974) (citing McGloin v. U.S., 232 A.2d 90, 91 (D.C. Ct. App. 1967) (roof and fire escape of multiple family house were not open to the public)). However, the ordinary understanding of "open to the public" suggests premises such as stores or parks that explicitly or implicitly invite the public for particular purposes. The apparently abandoned building at 124 Watts presents a closer call. Given that the building served no function that implicitly invited the public, and that plaintiffs were on the roof of the building (which was totally inaccessible to members of the public without a ladder), it was reasonable for defendants to conclude that the

---

[10] New York courts have stated that "presence on the roof of a dwelling from which trespassers are barred may justify a police officer's bare informational inquiry regarding the defendant's identity, address, and destination, but is not inherently indicative of criminality." People v. Heller, 689 N.Y.S.2d 327, 330-31 (N.Y. Crim. Ct. 1998) (building posted with "No Trespassing" and "Anyone who remains unlawfully upon these premises will be prosecuted" signs); see also People v. Bronston, 497 N.Y.S.2d 8 (1st Dep't 1986) (presence on the roof or at the top of the fire escape did not create evidence of criminal activity). These cases, however, involve buildings that were either dwellings or open for business and had roofs that were accessible to tenants or patrons and employees. Bronston emphasizes that there was nothing to suggest the "defendant did not actually have a legitimate right to be on the premises" and that the defendant's claim that he was an employee of the business was not disputed. The facts in the case at hand are distinct because a reasonable person could conclude that the roof was not open for use by anyone.

premises, and certainly the roof (where plaintiffs were located), were not "open to the public."

In view of the foregoing, defendants had probable cause to believe the plaintiffs were committing simple trespass, and thus for the arrest. Contrary to plaintiffs' suggestion (P. Mem. 28), officers may make an arrest for a violation. A violation is a "petty offense." N.Y. Crim. Proc. Law § 1.20(39). A police officer can make an arrest for a petty offense if he reasonably believes that the petty offense was committed in his presence. N.Y. Crim. Proc. Law § 140.10(1)(a), (2); see also Atwater v. Lago Vista, 532 U.S. 318 (2001). Therefore, probable cause for a violation was a permissible basis for an arrest.

### 3. Acting in Concert

A person is complicit in the offense of another when she "solicits, requests, commands, importunes, or intentionally aids such person to engage in such conduct," NY Penal Law § 20.00, with the necessary mental culpability for the offense. Although the plaintiffs and the defendants provide differing accounts of the actions of the three plaintiffs on the ground, the undisputed facts are sufficient to support a finding that defendants had probable cause to arrest them as accomplices of Korn and Vimo, the two plaintiffs on the roof.

Although plaintiffs contest whether Famulari and O'Neill saw get out of their van, they do not contest defendants' claim that Famulari and O'Neill saw them walk towards the building in a group, and then saw Davis, Lynch, and Smith watching Vimo and Korn on the roof. (Smith Dep. 54-56; Davis Dep. 17; Famulari Dep. 87; O'Neill Dep. 107.) That defendants observed all five plaintiffs approach 124 Watts together, two plaintiffs ascend to the roof, and three remain nearby on the sidewalk, apparently as look outs, is sufficient to have provided defendants probable cause to believe that the plaintiffs on the ground were intentionally aiding the plaintiffs

on the roof. Whether or not the officers' observations alone would be sufficient to establish guilt beyond a reasonable doubt at trial, the officers had reasonable ground for believing that all the plaintiffs were acting in concert.

B.    Malicious Prosecution

Probable cause for an arrest is often sufficient to provide probable cause for the ensuing prosecution. See Carter, 2004 WL 2181107, at *9. But, "in a malicious prosecution action, the relevant probable cause determination is whether there was probable cause to believe the criminal proceeding could succeed and, hence, should be commenced." Meija, 119 F. Supp. 2d at 254; see Kinzer v. Jackson, 316 F.3d 139, 143 (2d Cir. 2003) (one of four factors to establish malicious prosecution is "an absence of probable cause *for the proceeding*" (emphasis added)). "[P]robable cause is measured at a different point in time in a malicious prosecution action than a false arrest action, where the prosecution follows a warrantless arrest. . . . Accordingly, the existence, or lack, of probable cause is measured as of the time the judicial proceeding is commenced (e.g., the time of the arraignment), not the time of the preceding warrantless arrest." Meija, 119 F. Supp. 2d at 254.

Although the traditional rule is that "when an officer effects an arrest with probable cause, and there is no evidence that authorities became aware of exculpatory evidence undermining the probable cause to arrest between the time of the arrest and the ensuing prosecution, then probable cause to proceed exists to defeat a claim of malicious prosecution," Carter, 2004 WL 2181107, at *13, the facts presented in this matter do not neatly square with this often-repeated rule. While defendants had probable cause to arrest plaintiffs for simple trespass, plaintiffs were prosecuted, and defendants signed supporting documents for their prosecution, on

charges of criminal trespass and unlawful posting, the former a more serious charge.

Since there are two distinct charges underlying the prosecution at issue here, the Court must "separately analyze the charges claimed to have been maliciously prosecuted." See Posr v. Doherty, 944 F.2d 91, 100 (2d Cir.1991); Luthe v. City of Cape May, 49 F. Supp. 2d 380, 395 (D.N.J. 1999). But probable cause for simple trespass does not preclude a malicious prosecution claim as to either the criminal trespass or the unlawful posting charge. First, probable cause for simple trespass does not preclude a malicious prosecution claim as to the criminal trespass charge because the charged offense is a greater charge than the offense for which the police had probable cause. See Posr, 944 F.2d at 100 ("As disorderly conduct is a lesser charge than resisting arrest and assaulting an officer, . . . we should not allow a finding of probable cause on this charge to foreclose a malicious prosecution cause of action on charges requiring different, and more culpable, behavior."); Janetka v. Dabe, 892 F.2d 187, 190 (2d Cir. 1989); Kent v. Katz, 312 F.3d 568, 578 (2d Cir. 2002) (Newman, J., concurring); Washington v. Kelly, No. 03 Civ. 4638, 2004 WL 2601136, at *3 & n.42 (S.D.N.Y. Nov. 16, 2004); Reid v. City of New York, No. 00 Civ. 5164, 2004 WL 626228, at *5-*7 (S.D.N.Y. March 29, 2004); Luthe, 49 F. Supp. 2d at 394-96. Second, probable cause for simple trespass does not preclude a malicious prosecution claim as to the unlawful posting charge because the two charges involve "distinct" elements and "distinct" conduct. See Reid, 2004 WL 626228, at *5-*7; see also Janetka, 892 F.2d at 190. Accordingly, since defendants had no probable cause for the greater offense of criminal trespass, or for the distinct offense of unlawful posting, the Court must turn to the remaining three factors in the four-factor test for malicious prosecution as to both charges.

As to the first factor, the evidence suffices to establish that three of the defendants commenced a prosecution against plaintiffs. Gaghan signed the criminal court complaints against Smith, Lynch, and Vimo; Famulari signed a deposition in support of Gaghan's complaint against Smith, Lynch and Vimo; O'Neill signed the criminal court complaints against Korn and Davis. These actions, taken by police, are sufficient to satisfy the first factor. See Sulkowska v. City of New York, 129 F. Supp. 2d 274, 295 (S.D.N.Y. 2001); Pritzker v. City of Hudson, 26 F. Supp. 2d 433, 442 (N.D.N.Y. 1998).[11]

To satisfy the second factor, the proceeding must not only be terminated in the plaintiff's favor, but "indicate the accused's innocence." Fulton v. Robinson, 289 F.3d 188, 196 (2d Cir. 2002). Plaintiffs moved to dismiss the charges on the ground of facial insufficiency, the district attorney did not oppose the motion, and the criminal court dismissed all charges against plaintiffs. The prosecutor's failure to oppose the plaintiffs' motion to dismiss, and the criminal court's subsequent dismissal of all charges, clearly indicates plaintiffs' innocence, and thus the second factor as to malicious prosecution is satisfied.

The third factor is satisfied as well. As the Court's foregoing discussion made clear, defendants did not have probable cause to institute either the criminal trespass or the unlawful posting charge pressed against plaintiffs.

---

[11] Defendants inappropriately tweak the Second Circuit's language in Rohman, 215 F.3d at 217. In Rohman, the Second Circuit stated that "the mere reporting of a crime to the police and giving testimony are insufficient [to satisfy the first prong of a malicious prosecution claim]." Defendants took the liberty of inserting "[or by]" after "to," altogether altering the import of the language (D. Mem. 11), which expresses a desire to protect civilians who report crimes to and cooperate with the authorities from malicious prosecution claims, not officers who swear out complaints.

The fourth factor presents thornier issues – as does summary disposition of any dispute regarding mental state. In New York, "malice does not have to be actual spite or hatred, but means only 'that the defendant must have commenced the criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served.' " Lowth v. Town of Cheektowaga, 82 F.3d 563, 573 (2d Cir. 1996) (quoting Nardelli v. Stamberg, 44 N.Y. 2d 500, 502-03 (1978)). Plaintiffs are unable to point to any specific evidence in support of their allegation that they were targeted for their political beliefs rather than due to their arguably apparent criminal activity. Malice, however, "is seldom shown by direct evidence of an ulterior motive, but is usually inferred from the facts and circumstances of the investigation." Ramos v. City of New York, 729 N.Y.S.2d 678, 691 (1st Dep't 2001) (citations omitted). In light of this reality, the Second Circuit has concluded that a lack of probable cause for a prosecution, viewed in context, may provide evidence of malice. Lowth, 82 F.3d at 573; see also Wu v. City of New York, 934 F. Supp. 581, 592 (S.D.N.Y. 1996) (denying summary judgment on malicious prosecution where probable cause was lacking for arrest and prosecution, despite plaintiff's failure to bring forth specific evidence of malice).

Moreover, the criminal complaints signed and supported by defendants include material inaccuracies that create a genuine issue of fact as to defendants' states of mind in initiating the prosecution by filing the complaints. Most significantly, O'Neill's and Gaghan's complaints (Famulari signed a supporting deposition as to the latter) both state that 124 Watts is "in an abandoned building that is enclosed by a fence designed to exclude intruders." (Perez Decl. Ex. M.) Despite clear statements in O'Neill's and Gaghan's complaints and Famulari's supporting deposition that 124 Watts was enclosed by a fence, the photograph submitted in connection with

this motion, and Famulari's and Gaghan's own testimony in connection with this case (not to mention plaintiffs' testimony) is clear that 124 Watts was *not* enclosed by a fence. At his deposition, Famulari stated unequivocally that 124 Watts "is not enclosed by a fence designed to exclude intruders." When Famulari was further asked whether his representation in the complaint that the building was enclosed by a fence was inaccurate, he responded "I would say that that appears to be inaccurate, yes." (Famulari Dep. 165-66.) In response to questioning whether he "recall[ed] at any point after January 31st or on January 31, 2002, perceiving that this building was enclosed by a fence," Famulari unequivocally responded "No." Moreover, Gaghan's deposition testimony as to whether 124 Watts was enclosed by a fence contradicts his criminal complaint; at his deposition he stated "[i]t was like an open area, cemented. It was completely cemented an open area." (Gaghan Dep. 71.) Although plaintiffs testified as to the existence of fencing around the back of the property (Lynch Dep. 42, 44; Smith Dep. 51; D. 56.1 Stmt. No. 16.), in light of the photographs of 124 Watts and all the deposition testimony stating that the fence did *not* enclose the property (Perez Decl. Ex. A1 – A4; Famulari Dep. 165; Biscotti Dep. at 35; Mendez Dep. at 55-57; Gaghan Dep at 45), a reasonable jury could easily find that sworn statements that the building was enclosed by a fence were intentionally false, and thus indicative of malice.

Similarly, as to the unlawful posting charge, in their complaints, defendants merely recapitulated the unlawful posting statute to describe the plaintiffs' allegedly unlawful behavior that justified a prosecution. This description of plaintiffs' conduct is belied by the facts. As discussed above, there is no evidence to suggest that plaintiffs violated the unlawful posting statute. Indeed, Famulari in his deposition unequivocally admitted that none of the plaintiffs

violated any part of the statute reproduced in the defendants' complaints. (Famulari Dep. 181-83, 190-91.) If defendants fabricated in their criminal complaint facts that, if true, would have been sufficient to constitute probable cause for the crimes with which plaintiffs were charged – and a reasonable fact-finder could so conclude – then a genuine issue exists as to defendants' states of mind and credibility. Chimurenga v. City of New York, 45 F. Supp. 2d 337, 343-44 (S.D.N.Y.1999).

Finally, neither side has addressed the fifth requirement application to plaintiffs' federal claim, and thus the factual record is somewhat undeveloped as to whether plaintiffs were subjected to significant post-arraignment liberty restraints. Rohman, 215 F.3d at 215-16. The only pertinent information provided concerning plaintiffs' post-arraignment restraints is that they were released on their own recognizance the day after their arrest, on February 1, 2002, and that their attorney moved to dismiss the charges on April 4, 2002. But that is enough to create an issue of fact as to whether plaintiffs suffered sufficient liberty restraints to violate the Fourth Amendment and thereby carry plaintiffs' § 1983 malicious prosecution claim.

The Second Circuit has recognized that in New York, when a criminal defendant is released on her own recognizance, she must " 'render [her]self at all times amenable to the orders and processes of the Court,' and therefore must ordinarily remain in the state." Rohman, 215 F.3d at 216 (quoting N.Y. Crim. Proc. Law § 510.40). Restrictions on the right to travel, as well as required court appearances, may satisfy the restraint requirement for § 1983 malicious prosecution actions. Murphy v. Lynn, 118 F.3d 938, 945 (2d Cir. 1997); Rohman, 215 F.3d at 215-16. Thus, despite scant discussion by the parties on plaintiffs' post-arraignment liberty restraints, issues of fact as to those restraints preclude this Court from dismissing plaintiffs' §

1983 malicious prosecution claim on this motion.

Accordingly, viewing the facts in the light most favorable to plaintiffs, the evidence is sufficient to raise genuine issues of material fact with regard to the existence of probable cause, Famulari's, Gaghan's, and O'Neill's states of mind, and whether plaintiffs suffered sufficient post-arraignment liberty restraints in violation of the Fourth Amendment, and thus defendants' summary judgment motion as to plaintiffs' malicious prosecution claims against Famulari, Gaghan, and O'Neill is denied.[12]

III.   First Amendment Claim

Plaintiffs claim that their First and Fourteenth Amendment Rights were violated by defendants' allegedly retaliatory false arrest and malicious prosecution.  Defendants move for summary judgment on the grounds that there was probable cause to justify the arrest and prosecution of plaintiffs and that plaintiffs have presented no evidence to suggest that they were targeted for their political beliefs.  (D. Reply Br. 6-8.)[13]  Although the existence of probable cause for arrest defeats plaintiffs' First Amendment claim to the extent that it pertained to their arrest, see Carter, 2004 WL 2181107, at *14; Yajure v. DiMarzo, 130 F. Supp. 2d 568, 573-74

---

[12]  Plaintiffs voluntarily dismissed their malicious prosecution claims as to Mendez and Biscotti in their opposition to this motion.  (P. Mem. 43.)

[13]  Defendants failed to move for summary judgment as to plaintiffs' First Amendment claim in their memorandum on this motion, and raise the issue for the first time in their reply brief. Plaintiffs, noting defendants' failure to address plaintiffs' First Amendment claim, dropped a footnote in their opposition, requesting leave to submit argument as to why summary judgment should not be granted as to their First Amendment claim if defendants ultimately raised the issue, but never followed up after the defendants raised the issue in their reply brief.  As the various issues in this case overlap, the record as presented demonstrates genuine issues of material fact as to whether defendants' prosecution of plaintiffs was motivated by an unconstitutional bias against the content of their speech, and so the Court will not further address the failures of either party to focus on this claim.

22

(S.D.N.Y. 2001), plaintiffs' First Amendment claim as to the prosecution remains to be considered.

To establish a First Amendment retaliation claim, a plaintiff must prove that: (1) she has an interest protected by the First Amendment; (2) defendants' actions were motivated or substantially caused by his exercise of that right; and (3) defendants' actions effectively chilled the exercise of his First Amendment right.  Curley v. Vill. of Suffern, 268 F.3d 65, 73 (2d Cir. 2001); Blue v. Koren, 72 F.3d 1075, 1082 (2d Cir. 1995).

Plaintiffs have presented evidence that they were engaged in constitutionally protected speech.  As there are disputed issues of material fact as to the extent to which the defendants knew the content of plaintiffs' speech before placing them under arrest (Vimo 95; Korn 93-94.; O'Neill 221; P. Mem. 32-33, 36-37); to what extent the NYPD had surveilled Act-Up prior to the 2002 WEF  (P. 56.1 Counterstmt. No. 57; Perez Decl. Ex. V); and Famulari's, Gaghan's and O'Neill's states of mind in prosecuting plaintiffs for criminal trespass and unlawful posting, absent probable cause, the Court cannot decide as a matter of law that defendants' treatment of plaintiffs was not caused by plaintiffs exercise of their First Amendment rights.[14]  Finally,

---

[14]  Plaintiffs suggest that they were eligible for criminal court summonses, which would have entitled them to release from the scene of their arrests, and DATs, which would have resulted in their release in two to eight hours after their arrests, but were denied both due to the political activity in which they were engaged.  (P. Mem. 2-3, 17-18.)  The Second Circuit has recently highlighted the "discretionary" nature of the scheme by which New York issues DATs.  See Bryant v. City of New York, 404 F.3d 128, 138 (2d Cir. 2005).  Plaintiffs do not build any particular legal argument on either of these decisions made by law enforcement (nor have they sued Palmer, the desk officer who decided against issuing plaintiffs the DATs), but presumably point to these denials, along with the quick arrest of ACT-UP activists Milano and Loftus, who were attempting to hang a banner elsewhere in Manhattan, to show the defendants' bias and discrimination against plaintiffs based on their speech-cum-activism.  On the other hand, in an apparent attempt to show that DATs were not discriminatorily refused to ACT-UP activists, defendants state that Milano and Loftus, ACT-UP activists arrested at another location, verified

although evidence as to chilling may not be required on this motion since defendants have not established probable cause as to the charges with which plaintiffs were prosecuted, see Yuan v. Rivera, 48 F. Supp. 2d 335, 352 n.6 (S.D.N.Y. 1999); Dietz v. Damas, 948 F. Supp. 198, 213 (E.D.N.Y. 1996), the possibility of retaliatory prosecution itself creates an issue of fact as to chilling. Accordingly, although the record is not very well-developed in this regard, there are nonetheless issues of fact about plaintiffs' First and Fourteenth Amendment claim that preclude this Court from dismissing it on this motion.[15]

IV.     Immunity

Defendants argue that they are immune from suit. As the Court has dismissed all claims other than plaintiffs' malicious prosecution and First Amendment claims, the question presented is whether defendants Famulari, Gaghan, and O'Neill are immune from suit on those two claims.

A.      Federal Immunity

There are two questions to ask in determining federal qualified immunity. Saucier v. Katz, 533 U.S. 194, 201 (2001). The threshold question is: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violates a constitutional right?" Id. The facts alleged by the plaintiffs support claims of malicious

---

their addresses, and were issued DATs and released within a few hours of their arrests. Plaintiffs contest defendants' assertion that they did not verify their addresses for Palmer, asserting that Palmer in fact examined their drivers' licenses. (P. 56.1 Counterstmt. No. 50.) Plaintiffs' ultimate reliance, however, is on the claim that they were maliciously prosecuted in retaliation for their speech. Since the evidence suffices to defeat summary judgment on this claim, the Court need not address any inchoate argument that the denial of summonses or DATs would itself support a First Amendment claim.

[15] As the claim only survives only as to plaintiffs' malicious prosecution claims, however, and plaintiffs have dropped those claims against defendants Mendez and Biscotti, the First Amendment claim as to Mendez and Biscotti will also be dismissed.

prosecution in violation of the Fourth and Fourteenth Amendments, and retaliatory prosecution in violation of the First and Fourteenth Amendments, and thus the threshold is met. The subsequent question is whether "the law clearly established that the officer's conduct was unlawful in the circumstances of the case." Id. As there remains a question of fact as to defendant Famulari's, Gaghan's, and O'Neill's states of mind as to plaintiffs' malicious prosecution and First Amendment claims, the Court cannot grant defendants immunity on these claims as a matter of law. Qualified immunity is designed "to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct." Id. at 202. But where, as here, there is a question of fact as to whether defendants acted with malice in initiating a prosecution against plaintiffs, summary judgment on qualified immunity would be inappropriate. See Scott v. Sinagra, 167 F. Supp. 509, 516 (N.D.N.Y 2001).

B.      State Immunity

New York good faith immunity provides that a government employee is absolutely immune from suit "for those government actions requiring expert judgment or the exercise of discretion . . . when the action involves the conscious exercise of a judicial or quasi-judicial nature." Arteaga v. State, 532 N.Y.S.2d 57, 58-59 (1988). Whether the discretionary action receives absolute or qualified immunity turns on whether "the actor's position entails making decisions of a judicial nature." Id. at 59. In contrast, where a government employee performs duties ministerial or clerical in nature, no immunity attaches. Mon v. City of New York, 574 N.Y.S.2d 529, 531-32 (1991).

There is no question that police officers perform various discretionary functions for which immunity is appropriate. But New York immunity law is unclear as to whether police

officers receive absolute or qualified immunity when signing criminal complaints. The Court was unable to find any federal or state case wherein police-defendants sought New York state immunity for a state malicious prosecution claim. The distinction between absolute and qualified immunity is important as it is the difference between the state claim standing or falling. Whereas under absolute immunity defendants would be immune from suit regardless of the circumstances, under qualified immunity, defendants would not be immune if they undertook the prosecution of plaintiffs unreasonably or in bad faith. Arteaga, 532 N.Y.S.2d at 59.

As it is clear that defendants exercised discretion within their authority by signing criminal complaints against plaintiffs, and thus are eligible for state immunity of some sort, the only question faced by this Court is whether the decision to sign those complaints is properly characterized as "judicial" or "quasi-judicial," and accordingly deserving of absolute immunity under New York law. See Haddock v. City of New York, 554 N.Y.S.2d 439, 442-43 (1990) (discussing New York immunity standards); Mon, 574 N.Y.S.2d at 531-32 (same); Kravitz v. Police Dep't of Hudson, 728 N.Y.S.2d 267, 269 (3rd Dep't 2001) (applying qualified immunity standards to police action). Absent controlling state law to the contrary, or any serious argument by defendants suggesting that New York would or should adopt a different rule, the Court assumes that New York, like the United States, would not extend to police officers the absolute immunity given to judges or prosecutors, but would limit them to qualified immunity. For the reasons stated above, summary judgment is unavailable on qualified immunity because of the existence of issues of fact relating to defendants' states of mind.

V.   <u>Respondeat Superior Liability</u>

The plaintiffs' claim against the City of New York for respondeat superior liability is dependent on the claims of defendants' state law violations.  (Compl. ¶¶ 63-65.)  As the Court has dismissed the state law false arrest claims, the question is whether the City of New York may be held liable under a theory of respondeat superior on plaintiffs' state malicious prosecution claim.  The Court finds that it can.

"Under the common law . . . , a municipality may be held liable for common law . . . malicious prosecution on a theory of respondeat superior," <u>Chimurenga</u>, 45 F. Supp. 2d at 344 (citing <u>Johnson v. Town of Colonie</u>, 477 N.Y.S.2d 513, 514 (3rd Dep't 1984)); <u>Anthony v. City of New York</u>, No. 00 Civ. 4688, 2001 WL 741743, at *12 n.14 (S.D.N.Y. July 2, 2001), so long as the "plaintiff can show that the officer was acting in furtherance of the duties he owes to his employer and that the employer is, or could be, exercising some control, directly or indirectly, over the employees' activities."  <u>Kirk v. Metro. Transp. Auth.</u>, No. 99 Civ. 3787, 2001 WL 258605, at *7-*8 (S.D.N.Y. March 14, 2001) (internal quotation marks and citations omitted).  Here, defendants do not dispute that defendants were employed by the City of New York on the relevant dates, and "were acting within the scope of their employment and in furtherance of the City's business."  (D. Mem. 24-25.)  Moreover, since there is a question as to the propriety of the defendants' conduct, the City is not immune from this claim.  <u>See</u> <u>Lubecki v. City of New York</u>, 758 N.Y.S.2d 610, 617 (1st Dep't 2003) ("[T]he immunity afforded a municipality for its employee's discretionary conduct does not extend to situations where the employee, a police officer, violates acceptable police practice.").

## CONCLUSION

Defendants' motion for summary judgment is denied as to Counts Two, Three, and Five with regard to Famulari, O'Neill, and Gaghan, and as to Count Nine with regard to the City of New York, and is granted in all other respects.

SO ORDERED.

Dated: New York, New York
      May 25, 2005

                                    GERARD E. LYNCH
                          United States District Judge